UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

ROBERT J. EWART,                          )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )
                                          )   Case No. 15-cv-155-JED-FHM
MOHAMED A. HALAC; and,                    )
GREAT CARRIER, LLC, a                     )
Minnesota Transport Company,              )
                                          )
            Defendants.                   )

---

## DEFENDANTS' COMBINED RESPONSE TO
## PLAINTIFF'S MULTIFARIOUS MOTION *IN LIMINE*

---

Respectfully submitted,

Brad L. Roberson, OBA No. 18819
Paul M. Kolker, OBA No. 18749
Erin J. Rooney, OBA No. 31207
PIGNATO, COOPER, KOLKER & ROBERSON, P.C.
Robinson Renaissance Building
119 North Robinson Avenue, 11th Floor
Oklahoma City, Oklahoma 73102
Telephone:    405-606-3333
Facsimile:    405-606-3334
**ATTORNEYS FOR DEFENDANTS**

DATED: FEBRUARY 10, 2016

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

1. & 2.  PLAINTIFF'S EXTENSIVE CRIMINAL HISTORY AND PROPENSITY TO OFFER ONE-SIDED VERSIONS OF PAST CRIMINAL ACTS ARE ADMISSIBLE AT TRIAL FOR IMPEACHMENT. . . . . . . 1

3.  THE COLLATERAL SOURCE DOCTRINE HAS NEVER BEEN CONSTRUED TO PERMIT PLAINTIFF TO "CHALKBOARD" MEDICAL BILLS THAT WERE NEVER INCURRED.. . . . . . . . . . 6

4.  EVIDENCE OF PLAINTIFF'S OTHER COLLATERAL SOURCES OF BENEFITS ARE ALSO ADMISSIBLE TO IMPEACH PLAINTIFF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5.  PRE AND POST-ACCIDENT CRASHES BEAR DIRECTLY ON PLAINTIFF'S ALLEGED INJURIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

6.  UNDER NEWLY REVAMPED LAW, NON-USE OF A SEAT BELT IS ADMISSIBLE.. . . . . . 17

7.  NOT IN ORIGINAL.  ERROR IN NUMBERING IN PLAINTIFF'S MULTIFARIOUS MOTION *IN LIMINE*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

8.  LEGAL STANDARD FOR EXPERT TESTIMONY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9.  12 O.S. § 3009.1 IS BOTH CONSTITUTIONAL AND APPLICABLE. . . . . . . . . . . . . . . . 19

PROPOSITION I:  TITLE 12 O.S. § 3009.1 IS NOT A SPECIAL LAW, AND THEREFORE, DOES NOT VIOLATE ARTICLE 5 § 46 OF OKLAHOMA'S CONSTITUTION.. . . . . . . . . 20

PROPOSITION II:  TITLE 12 O.S. § 3009.1 DOES NOT TREAT THE INSURED AND UNINSURED UNEQUALLY.. . . . . . . . . . . . . . . . . 24

PROPOSITION III: TITLE 12 O.S. § 3009.1 DOES NOT DENY THE PLAINTIFFS DUE PROCESS AND TRIAL BY JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Addington v. State of Texas,*
 441 U.S. 418 (1979)........................................... 18

*Application of Oklahoma Capitol lmprovement Authority,*
 958 P.2d 759 (Okla. 1998)*, cert. denied* 525 U.S. 874 (1998)............ 19-20

*Burks v. Walker,*
 109 P. 544 (Okla. 1909)...................................... 21-22

*Christian v. Gray,*
 65 P.3d 591 (Okla. 2003)....................................... 18

*City of Anadarko v. Fraternal Order of Police, Lodge 118,*
 934 P.2d 328 (Okla. 1997)...................................... 25

*City of Enid v. Pub'l Employees Relations Bd.,*
 133 P.3d 286 (Okla. 2006)...................................... 21

*Corenbaum v. Lampkin,*
 156 Cal.Rptr.3d 347 (Cal. App. 2013)............................. 6-7

*Denco Bus Lines v. Hargis,*
 229 P.2d 560 (Okla. 1951)....................................... 7

*Dodd v. State,*
 100 P.3d 1017 (Okla. Crim. App. 2004) ............................ 5

*Eateries, Inc. v. J.R. Simplot Co.,*
 346 F.3d 1225 (10th Cir. 2003) .................................. 23

*Fent v. Oklahoma Capitol Improvement Authority,*
 984 P.2d 200 (Okla. 1999)...................................... 19

*Gladden v. P. Henderson & Co.,*
 385 F.2d 480 (3rd Cir. 1967)..................................... 8-9

*Glasco v. State ex rel. Oklahoma Dept. of Corr.,*
 188 P.3d 177 (Okla. 2008)................................... 23, 25-26

iii

*Higgins v. State Auto Prop. & Cas. Ins. Co.*,
     11-CV-90-JHP-TLW, 2012 WL 2571278 (N.D. Okla. July 2, 2012). . . . . . . . . . . 9

*In re Jarvis*,
     431 S.W.3d 129 (Tx. Ct. App. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Newman*,
     23 A.D.3d 816, 803 N.Y.S.2d 741 (N.Y. App. Div. 2005). . . . . . . . . . . . . . . . . 13

*Lafalier v. Lead-Impacted Communities Relocation Assistance Trust*,
     237 P.3d 181 (Okla. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21, 26-27

*McKellips v. Saint Francis Hosp., Inc.*,
     741 P.2d 467 (Okla. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McWilliams v. Exxon Mobil Corp*,
     111 So.3d 564 (La. Ct. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Oklahoma Industries Authority v. Barnes*,
     769 P.2d 115 (Okla. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Potts v. Sam's Wholesale Club*,
     1977 WL 126089 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Reed v. Scott*,
     820 P.2d 445 (Okla. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

*Reynolds v. Porter*,
     760 P.2d 816 (Okla. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rivas v. Parkland Manor*,
     12 P.3d 452 (Okla. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Robinson v. Borg-Warner Protective Service Corp.*,
     31 P.3d 1041 (Okla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rucker v. Mid-Century Ins. Co.*,
     945 P.2d 507 (Okla. Civ. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Rush Truck Center v. Watson*,
     159 P.3d 1146 (Okla. Civ. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sanchez v. Brooke*,
    138 Cal.Rptr.3d 507 (Cal. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*St. Louis-SF Railway v. Nessmith*,
    435 P.2d 602 (Okla. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Surety Bail Bondsmen of Okla., Inc. v. Ins. Comm'r*,
    243 P.3d 1177 (Okla. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Townsend v. Dollar General Store*,
    864 P.2d 1303 (Okla. Civ. App. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*United States v. Lowe*,
    569 F.2d 1113 (10th Cir.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Woods v. Unity Health Center, Inc.*,
    196 P.3d 529 (Okla. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Young v. Anderson*,
    513 F.2d 969 (10th Cir.1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Zeier v. Zimmer, Inc.*,
    152 P.3d 861 (Okla. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

## Other Authorities

12 N.Y. Comp. Codes R. & Regs. tit. 12, § 473.1. . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 N.Y. Comp. Codes R. & Regs. tit. 12, § 473.2 . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 O.S. § 2608. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

12 O.S. § 3009.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

23 O.S. § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

23 O.S. § 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 O.S. § 2-205.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

47 O.S. § 11-902(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

47 O.S. § 12-420 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

FED. R. EVID. 608. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.Y. Labor Law § 500 (McKinney 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

N.Y. Labor Law § 501 (McKinney 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

N.Y. Labor Law § 590 (McKinney 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

N.Y. Labor Law § 591 (McKinney 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

Okla. 2013, 1st Extr. Sess., HB 1015, c. 11, § 5). . . . . . . . . . . . . . . . . . . . . . . . 17

OKLA. CONST., art. II, § 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-26

OKLA. CONST., art. II, § 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

OKLA. CONST., art. II, § 19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Defendants submit the following Response to Plaintiff's Multifarious Motion *in Limine.*

**1 & 2.  PLAINTIFF'S EXTENSIVE CRIMINAL HISTORY AND PROPENSITY TO OFFER ONE-SIDED VERSIONS OF PAST CRIMINAL ACTS ARE ADMISSIBLE AT TRIAL FOR IMPEACHMENT.**

After being confronted with court records of prior drunk driving convictions, Plaintiff finally came clean.  He now admits four prior convictions:

> Q (by Mr. Kolker):    You've been convicted four times for drunk driving; correct?
>
> A (by Plaintiff):       Yes.

(*See* Plaintiff's Deposition, 54:5 – 7, **EXHIBIT 1**.)  Prior to being cross-examined – and confronted with evidence of prior DUI convictions – Plaintiff omitted most of his criminal history.  (*See* Plaintiff's Deposition, pp. 50-51, **EXHIBIT 1**.)[1]

These omissions are consistent with Plaintiff's past conduct.  Plaintiff has been convicted of DUI on four separate occasions: June 1991, April 2006, July 2007, and May 2015.  (*See* Plaintiff's Deposition, 53 – 54, **EXHIBIT 1**.)  Yet, strange as it may seem, Plaintiff was recently prosecuted in Oklahoma as a "first time" DUI offender.  (*See* Judgment and Sentence, filed May 20, 2015, *State of Oklahoma v. Ewart, Robert*, CM-2014-448, **EXHIBIT 2**.)[2]  Plaintiff insists that he disclosed all of his prior convictions.  (*See* Plaintiff's Deposition, 55:5 – 20, **EXHIBIT 1**.)  However, no evidence of any such disclosure exists, and Plaintiff somehow emerged from all four cases as a "first time" offender.  Plaintiff is simply lucky that the Mayes County District Attorney was not made aware of

---

[1] Notably, Plaintiff is from New York.  He may have believed that his criminal history from that state would never be unearthed.

[2] Pursuant to 47 O.S. § 11-902, "first time" offenders are convicted of a misdemeanor.  *Id.* Repeat offenders, on the other hand, are charged with a felony.  *Id.*

Plaintiff's prior convictions in the State of New York. Otherwise, he would be a convicted felon. 47 O.S. § 11-902(c)(2).

Plea negotiations associated from the 2014 criminal case show equally disturbing omissions, and overall "gaming" of the system. For instance, as a condition of Plaintiff's plea agreement, Plaintiff was required to submit an "Asset Disclosure Affidavit" (ostensibly to gauge the appropriate amount of criminal restitution). Within it, Plaintiff claimed:

- that he was financially destitute and unable to pay his fines;
- that he was raising two sons; and,
- that no one owed him money.

(*See* Plaintiff's Asset Disclosure Statement, filed May 18, 2015, *State of Oklahoma v. Ewart, Robert*, CM-2014-448, **EXHIBIT 3**.)

Nothing could be further from the truth. Only four months earlier, Plaintiff filed the present lawsuit in which he has since testified that Defendants owe him $3,575,000.00. (*See* Plaintiff's Deposition, 27:7 – 10, **EXHIBIT 1**.) Plaintiff has also since admitted that he lives alone. (*See* Plaintiff's Deposition, 6: 22 – 25, **EXHIBIT 1**.) Both of his sons are adults, ages 18 and 19, living in Virginia and Pennsylvania. (*See* Plaintiff's Deposition, 18: 1 – 10, **EXHIBIT 1**.) (*See* Plaintiff's Deposition, 17:23 – 25, **EXHIBIT 1**.) Plaintiff "could not remember" the last time they lived with him, and recently testified their visitation was "off and on" for a few years prior to 2012. (*See* Plaintiff's Deposition, 18, 1 – 10, **EXHIBIT 1**.)

Going one large step further, Plaintiff orchestrated a clever way to dodge the only "teeth" in his criminal sentence. Unknown to the trial judge who sentenced Plaintiff to 120 hours of community service in 2015, Plaintiff had scheduled back surgery *before* community service was ordered. (*See* Plaintiff's deposition, 31:18 – 21, **EXHIBIT 1**.) Thus, just one month after being ordered to complete community service, Plaintiff filed a motion to be excused from it, which the court granted. (*See*

Motion to Modify Terms and Conditions of Probation, filed June 16, 2015, and Order of August 10, 2015, *State of Oklahoma v. Ewart, Robert*, CM-2014-448, **EXHIBIT 4**) (stating Plaintiff had undergone back surgery and was "convalescing in his home.")  In effect, the four time "first offender" avoided punishment.

As another example, Plaintiff omitted a 2006 drunk driving conviction from written discovery.  (*See* Plaintiff's deposition, pp. 34-35, **EXHIBIT 1**.)  Plaintiff swears he "forgot." However, it is unlikely Plaintiff forgot about a full-fledged police chase through four separate communities in upstate New York.  In fact, Plaintiff's explanation of this particular incident borders on the ridiculous.

To begin with, Plaintiff refused to provide a credible explanation for being on the road at **2:00 a.m.** that morning:

> Q      What were you doing out at 2:00 in the morning that night?
>
> A      Driving. I do that sometimes.
>
> Q      Just going for a drive?
>
> A      Sure...

(*See* Plaintiff's Deposition, 46:3 – 7, **EXHIBIT 1**.)

Next, Plaintiff denied the police chase ever occurred.  (*See* Plaintiff's Deposition, pp. 37-38, **EXHIBIT 1**.)  Last but not least, despite having admittedly later pleading guilty to DUI, Plaintiff denied that he was under the influence of alcohol at 2:00 a.m. while police were chasing him. Instead, Plaintiff blames "elevated blood sugars."  This was the same claim he made in 2006 when he was taken to the hospital in handcuffs:

> The patient is a 44-year-old white male who is brought in by **Philadelphia State Police** after he was pulled over from a **car chase** that started in Philadelphia and went through Evans Mills and Fort Drum and ended up here in Carthage.  **The patient states his blood**

> sugar is elevated and when it gets elevated he begins to have
> trouble with his vision and trouble seeing where he is going. ***
> the patient is **very evasive**, stating that he will have laboratory work
> done in an attempt to diagnose his **stuttering speech** and **his lack of
> concentration, his pause at answering**, and his **inability to
> complete the alphabet** with 3 interruptions. *** the patient permitted
> a limited physical exam and **declined blood work. He declined a
> police blood alcohol kit or breathalzyer as well**. *** the patient
> does have an **odor of alcoholic beverage** on his breath...

(*See* Emergency Department Report from Carthage Memorial Hospital, dated November 18, 2006,

**EXHIBIT 5**) (emphasis added).

Plaintiff's story does not add up. As the time of Plaintiff's arrest in 2006, his blood sugar

level was 295. (**EXHIBIT 5**.) According to Plaintiff, this blood sugar level was sufficient to make

him look, smell, and act like a drunk driver. In comparison, Plaintiff's blood sugar level after the

subject accident was **355**. (*See* Plaintiff's Deposition, pp. 69-70, 83, **EXHIBIT 1**.) To the extent that

Plaintiff intends to testify at trial concerning the events of this accident and events following it, the

circumstances surrounding his prior actions with a blood sugar level of 295 are certainly relevant to

his version of events.

Equally important, Plaintiff's attempts to "cover up" his crime are directly relevant to his

propensity to tell the truth in a court of law. Indeed, even after Plaintiff was confronted with his

prior arrest, the conviction, and details of his brief hospital stay, Plaintiff refuses to tell the truth.

For instance, Plaintiff initially denied any recollection of the arrest or the police chase.

However, when pressed for details regarding the odor of alcohol, Plaintiff recalled having "some

beers" 13-14 hours prior to his arrest.

> I remember talking to my lawyer. And I did have some beers earlier
> in the day and had not brushed my teeth or had anything to eat
> since then.

(*See* Plaintiff's Deposition, 46:11 – 24, **EXHIBIT 1**.)

4

Plaintiff's explanation to his doctor, the police, and now this Court, were a deliberate effort to "white wash" his past and conceal a crime. Only through Defendants' counsel's due diligence was this information ever able to come to light.

The fact that Plaintiff omitted this crime and the events underlying it in response to his sworn Interrogatory responses, and the fact that he again omitted the crime during his deposition, bear directly upon Plaintiff's credibility. Specifically, Plaintiff identified only two prior arrests for DUI, when there were in fact four arrests and four convictions. (*See* Plaintiff's deposition, 55 – 58, **EXHIBIT 1**.)

A very similar issue was addressed by the Oklahoma Court of Criminal Appeals in *Dodd v. State*, wherein, the court held that under 12 O.S. § 2608, which is identical in substance to FED. R. EVID. 608, specific instances of a witnesses conduct were admissible on cross-examination, whether or not they resulted in a felony conviction, "if they bear on his 'character for truthfulness.'" 100 P.3d 1017, 1039 (Okla. Crim. App. 2004) (quoting 12 O.S. § 2608). Specifically, "[t]he details of [the defendant's] criminal history were directly relevant to his credibility as a witness. *Id.* The defendant had made material misrepresentations to the police in an effort to diminish his role in a prior robbery and avoid harsher punishment for his more recent violations. *Id.* The court concluded: "[a] witness who offers one-sided versions of his own past conduct subjects himself to cross-examination aimed at showing the jury that he is not telling the whole truth about that conduct, and therefore, cannot be trusted to tell the truth about other matters either." *Id.* at 1039-40.

In the instant case, it is not the prior act itself, drinking while driving, which is probative. Rather, it is Plaintiff's attempt to "cover it up." Plaintiff has shown time and time again that he is fully willing to misrepresent facts to any court in order to avoid accountability for his own actions.

Defendants should be permitted to inquire of cross-examine Plaintiff for the limited purpose of exposing his propensity to lie.

Rule 608 of the Federal Rules of Evidence grants the trial court broad, almost unfettered discretion to permit a witness to be cross-examined on specific instances of conduct probative of a witness' character for truthfulness or untruthfulness. The determination of whether the evidence is relevant is within the sound discretion of the trial court. *Young v. Anderson*, 513 F.2d 969, 973 (10th Cir.1975). Significantly, this Court's ruling on evidentiary matters will not be upset absent an abuse of discretion. *United States v. Lowe*, 569 F.2d 1113, 1116 (10th Cir.1978).[3]

3. **THE COLLATERAL SOURCE DOCTRINE HAS NEVER BEEN CONSTRUED TO PERMIT PLAINTIFF TO "CHALKBOARD" MEDICAL BILLS THAT WERE NEVER INCURRED.**

Both the subject accident and Plaintiff's suit occurred after November 1, 2011, the enactment date of 12 O.S. § 3009.1. Section 3009.1 applies to "any civil action." By its express terms, it limits Plaintiff's damages to the actual amounts paid for any doctors' bills, hospital bills, ambulance service bills, drug bills and similar bills for expenses incurred in the treatment of the party.

In construing a similar statute the Texas appellate courts have determined that such a result did not run afoul of the collateral source rule. *See In re Jarvis*, 431 S.W.3d 129 (Tx. Ct. App. 2013); *See also McWilliams v. Exxon Mobil Corp.*, 111 So.3d 564, 577 (La. Ct. App. 2013) (holding the plaintiff was only entitled to recover the amount of medical expenses which had actually been paid by the plaintiff, not the amount which had been billed.) By way of further example, where a medical provider enters into an agreement with a private insurer wherein the provider agrees to accept a discounted payment for services provided to insured parties (*i.e.,* the "negotiated rate differential"), the discounted rate, rather than the full amount billed, is admitted at trial. *See Id.; see also*

---

[3] Also, jury instructions address the purpose and reach of witness impeachment based upon prior criminal convictions. *See* OUJI 3.14.

*Corenbaum v. Lampkin,* 156 Cal.Rptr.3d 347, 359 (Cal. App. 2013). To that end, the collateral source rule has no applicability to medical expenses that the plaintiff did not actually incur. *See Sanchez v. Brooke,* 138 Cal.Rptr.3d 507, 518-19 (Cal. App. 2012). As *Sanchez* explains,

> The collateral source rule . . . has no bearing on amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment. . . . The collateral source rule precludes certain deductions against otherwise recoverable damages, but does not expand the scope of economic damages to include expenses the plaintiff never incurred.

*Id.* (internal citations and quotations omitted).

The Oklahoma Collateral Source Rule merely prevents a tortfeasor from benefitting from payments made by sources "wholly independent" of the wrongdoer. *Denco Bus Lines v. Hargis*, 229 P.2d 560 (Okla. 1950). Write-offs and charge-offs on Plaintiff's medical bills are merely an adjustment to the bill and do not reflect a payment by Plaintiff or the collateral source. Simply put, these amounts are dollars that nobody will ever pay. Accordingly, Plaintiff's attempt to exclude payments by collateral sources does not include adjustments made by Ewart's medical providers as contemplated by Section 3009.1.

Regardless, even if the collateral source rule were applicable, Section 3009.1 evidences the Oklahoma Legislature's desire to abrogate the collateral source rule in this instance. That is clear considering the statute only allows the admission of medical bills to the extent a plaintiff has made actual payment, where a lien is filed by the provider, or the bills reflect the Medicare reimbursement rate for services in the case of nonpayment. Section 3009.1 removed the need of the collateral source rule by only allowing those medical bills incurred by the plaintiff to be admissible at trial. Accordingly, Plaintiff's Motion *in Limine* should be denied, and Plaintiff should not be allowed to present evidence of false medical billing in violation of Section 3009.1.

The Oklahoma Supreme Court has also held that collateral source evidence is admissible for purposes unrelated to exposing a collateral benefit, such as attacking a witnesses credibility. *See Robinson v. Borg-Warner Protective Service Corp.*, 31 P.3d 1041 (Okla. 2001). For example, evidence of a collateral source is admissible to rebut evidence of "family stress" and "aggravation" purportedly caused by unpaid medical bills if it can be shown that all such bills were paid by a collateral source. *See Rucker v. Mid-Century Ins. Co.*, 945 P.2d 507, 511 (Okla. Civ. App. 1997). The trial judge in *Rucker* ruled that the defendant was not required to leave plaintiff's "plea of poverty" unchallenged. *Id*. Thus, on cross-examination, in response to plaintiff's testimony regarding the financial impact of the medical bills, defense counsel exposed the fact that plaintiff's medical bills were, in fact, paid by plaintiff's health insurer and various other collateral sources. The trial court's ruling was affirmed on appeal.

In affirming the trial judge, the *Rucker* court cited with approval *Gladden v. P. Henderson & Co.*, 385 F.2d 480, 484 (3rd Cir. 1967), a 3rd Circuit case involving the admissibility of workers' compensation benefits, which also generally constitute a collateral source. In *Gladden,* plaintiff testified that for seven weeks after the accident he was under care of a doctor and unable to work. *Id* at 482. During this time frame, plaintiff received workers' compensation benefits. *Id*. When asked why he did not return for additional treatment, plaintiff replied: "'Well, during the seven weeks that I was out of work seeing [the doctor,] my bills got behind and when I went back to work, that was one of the main reasons I went back to work, was to try to catch my bills up and support my family.'" *Id*. After plaintiff reiterated that his return to work was due to financial distress, defense counsel was allowed to impeach the witness with evidence of workers' compensation benefits received by the plaintiff. *Id* at 483. The trial judge stated he permitted such evidence because the

plaintiff, "**himself opened the subject** in his testimony."[4] *Id* (emphasis added). On appeal, the United States Court of Appeals for the Third Circuit held: "[t]o have forbidden such cross-examination would have conferred on plaintiff the unparalleled right to give testimony on direct examination with immunity from inquiry on cross-examination." *Id. at 483*. The court further reasoned:

> The collateral benefit rule cannot be made a springboard from which a plaintiff may go forward with affirmative evidence that he returned to work while he was still ailing, because of financial need and then seek immunity from cross-examination regarding it.

*Id* at ¶17, *citing Gladden v. P. Henderson & Co.*, 385 F.2d 480, 484 (3rd Cir. 1967).

Therefore, in Oklahoma, "such evidence may be properly introduced to rebut any claims by Plaintiff of emotional and financial hardship due to the amount of unpaid medical bills." *Higgins v. State Auto Prop. & Cas. Ins. Co.*, 11-CV-90-JHP-TLW, 2012 WL 2571278, at *2 (N.D. Okla. July 2, 2012). Here, Plaintiff has put forth a claim that his inability to pay his medical bills has caused him emotional and financial hardship. Specifically, Plaintiff testified on multiple occasions during his deposition that the present accident has caused him a great deal of "stress." (*See* Plaintiff's deposition, 12 – 13; 40 – 44; and 132 – 135, **EXHIBIT 1**.) When asked to explain the extent to which his stress disorder has worsened as a result of the accident, Plaintiff testified that his heightened stress is directly correlated with his inability to pay medical bills. (*See* Plaintiff's deposition, 43:10 – 19, **EXHIBIT 1**.)[5]

---

[4] Plaintiff has also testified that he returned to work following this accident solely because he was in need of the money (despite the fact that he was concurrently receiving paid time off).*See* Plaintiff's deposition, pp. 156-157, **EXHIBIT 1**.) ("It was an economic decision.")

[5] Plaintiff also suffers from a stress disorder which has required constant medication since around 2005 (when he divorced his second wife). (*See* Plaintiff's deposition, 40 – 44, **EXHIBIT 1**.)

Because Plaintiff has made a "plea of poverty," complained about a mountain of medical bills, and suggests that this financial distress has caused him aggravation, emotional toil, and the like, Defendants should be afforded an opportunity to cross-examine Plaintiff and reveal the truth. To hold otherwise would deprive Defendants of the ability to cross-examine Plaintiff and his witnesses and simultaneously immunize Plaintiff from this misleading and prejudicial testimony. The fact that this form of impeachment may indirectly reveal payment from a collateral source is a distinction without difference. Lies or exaggerations may be exposed on cross-examination.

4.     **EVIDENCE OF PLAINTIFF'S OTHER COLLATERAL SOURCES OF BENEFITS ARE ALSO ADMISSIBLE TO IMPEACH PLAINTIFF.**

Proposition No. 4 fails for the same reasons as Proposition No. 3. Plaintiff has made a claim for emotional distress as a direct result of Plaintiff's negligence. This stress stems in whole or part from Plaintiff's claimed inability to pay medical bills. (*See* Plaintiff's deposition, 12 – 13; 40 – 44; and 132 – 135, **EXHIBIT 1**.) Oklahoma law does not permit Plaintiff to simultaneously assert this claim of emotional distress or "plea of poverty" on account of his inability to pay his medical bills, while simultaneously receiving benefits from a collateral source (*e.g.*, social security disability and unemployment benefits) that obviate the alleged financial stress. *See Rucker v. Mid-Century Ins. Co.*, 945 P.2d 507, 511 (Okla Civ. App. 1997).

Discovery has recently revealed yet a further ground for admitting this type of evidence. Plaintiff is claiming that the injuries incurred in the subject automobile accident have left him "totally disabled from performing any kind of physical labor." Unsurprisingly, Plaintiff claims both his disability and his inability to land gainful employment are a result of this accident and nothing else. He is currently seeking in excess of $1,500,000.00 on account of his claimed disability and lost future earnings.

Q:      All right. The next one is "Physical disability and impairment temporary and permanent. How much are you seeking for that component of damages, Mr. Ewart?

A:      $500,000.

                        *        *        *

Q:      The next one is "Loss of earnings and earning capacity." How much are you seeking for that?

A:      $ 1 million.

(*See* Plaintiff's deposition, 25:4 – 16, **EXHIBIT 1**.)

At the time of the accident, Plaintiff was working as a machinist.  (*See* Plaintiff's deposition,

107, **EXHIBIT 1**.)  He offered the following testimony concerning the accident's effect on his ability

to work.

Q:      How long did you work [at HE&M Saw]?

A:      June 2012 until – I believe it was March I went out on disability. March 2013, I had to go out on disability, but in between, I was missing a lot of time. I had like two weeks off after the accident, maybe three, and I went – they took me back to work and tried to reduce my workload, and I just couldn't do it.

                        *        *        *

Q:      Why did you leave HE&M Saw?

A:      I was let go after the six months of disability. I was terminated.

Q.      This accident happened in January of 2013, and I thought you told me you left there around March of 2013. Is that right, or did I write something down –

A:      That's when I went on disability.

Q:      In March?

11

Q:     Yes. I was missing a lot of time. I wasn't able to perform my duties.

Q.     Okay. So after six months of that –

A:     They terminated me.

(*See* Plaintiff's deposition, 107 – 110, **EXHIBIT 1**.)

After supposedly being terminated on account of his inability to perform his job duties (despite receiving preferential and reduced workloads from his employer), and qualifying for disability benefits through his employer, Plaintiff sought unemployment insurance ("UI") benefits from the State of New York's Department of Labor.  (*See* Plaintiff's Application for UI Benefits, dated October 2, 2013, **EXHIBIT 6**.)   On his application for UI benefits, under "reason for separation," Plaintiff indicates he was "discharged/unable to meet standards."   (*See* Plaintiff's Application for UI Benefits, **EXHIBIT 6**.)  Immediately following this statement, under the Eligibility Information (Part 2 section), Plaintiff answers "yes" to the question if he is "able and available to start work immediately."  (*See* Plaintiff's Application for UI Benefits, **EXHIBIT 6**.)  In other words, in the eyes of the New York Department of Labor, Plaintiff held himself out as "ready, willing and capable of employment," a condition precedent to UI benefits.  In other words, Plaintiff stated on his New York application for governmental UI that he was ***able and available to work immediately***, knowing full well that he was simultaneously pressing a ***disability claim*** with his employer.  (*See* Plaintiff's deposition, 107 – 110, **EXHIBIT 1**.)

In summary, Plaintiff's disability claim is directly contradicted by a UI benefits claim he filed with the New York Department of Labor.  As a condition precedent to receiving unemployment benefits, Plaintiff was required to certify (under oath) the he was ready, willing, and capable of employment – the exact opposite of what is claimed in this case.  N.Y. LABOR LAW § 591

(McKinney 2013).[6]  In fact, before Plaintiff's unemployment claim was even <u>considered</u>, Plaintiff was required to submit a true and correct statement of all material facts, including his **ability to work**; **availability for work**, and activities or conditions which could restrict him from seeking or accepting full-time employment immediately.  *See* 12 N.Y. COMP. CODES R. & REGS. tit. 12, §§ 473.1, 473.2.  In addition, once qualified, Plaintiff was required to provide the New York Department of Labor with weekly reports relating to his ongoing quest for employment.  *In re Newman*, 23 A.D.3d 816, 816, 803 N.Y.S.2d 741 (N.Y. App. Div. 2005).

These records are admissible to demonstrate **what** Plaintiff said in his certified answers to these government agencies, how **frequently** he said it, and to demonstrate **why** he may have said it.  These statements are certainly admissible to impeach Plaintiff's credibility at trial.  A jury may likely wonder if Plaintiff will say anything to recover money.

The unemployment benefits discussed above, which Plaintiff last sought in 2013, are governed by Article 18 of the NEW YORK LABOR LAW.  *See* N.Y. LABOR LAW § 500, *et. seq*. (McKinney 2013) (hereinafter the "Act").  It is the intent of the Act to provide state-funded unemployment reserves for the "benefit of persons unemployed through no fault of their own." *See* N.Y. LABOR LAW § 501 (McKinney 2013) ("Declaration of State Public Policy").

The Act's eligibility requirements are expressly defined by law.  They state:

> No benefits shall be payable to any claimant who is not capable of work or who is not ready, willing and able to work in his or her usual employment or in any other for which he or she is reasonably fitted by training and experience and who is not actively seeking work.

*See* N.Y. LABOR LAW § 591 (McKinney 2013).

---

[6]Oklahoma law has an identical requirement.  *See* 40 O.S. § 2-205.1.

The Act's stringent requirements are based upon the sad reality that many people abuse the system. In fact, due to this reality, the Legislature has declared that anyone making a "false statement" in an effort to obtain or increase any benefit shall be subject to forfeiture of the benefits, and civil fines. *See* N.Y. LABOR LAW § 590(1) (McKinney 2013)

As set forth above, Plaintiff has claimed **full** and **complete** disability from this accident. At one and the same time, he pursued UI benefits from the State of New York. The representations made to the new York Department of Labor, when compared to the sworn testimony in this case, reveals inconsistent statements – lies – that bear directly upon Plaintiff's credibility. It is for these reasons that Plaintiff's records concerning his disability insurance and UI benefits are admissible.

An identical issue was addressed in *Townsend v. Dollar General Store*, 864 P.2d 1303 (Okla. Civ. App. 1993). In that case, an employee filed a workers' compensation claim that sought temporary total disability ("TTD") benefits, *i.e.*, lost wages. These lost wages were attributable to the on-the-job injury. Contemporaneously with the filing of workers' compensation benefits, the same employee also sought and received unemployment compensation. In other words, the plaintiff-claimant in *Townsend* argued he was incapable of work during litigation, but simultaneously claimed he was fully capable of working while pursuing unemployment benefits. Based upon these facts, the defendant in *Townsend* sought to utilize the Oklahoma Employment Security Commission records for impeachment purposes.

On appeal, the plaintiff argued the unemployment records failed to evidence an inability to work, but rather, merely demonstrated plaintiff was "desperate for money." *Id.* The court squarely rejected this argument. In fact, the court specifically found that plaintiff's argument was "without merit." *Id.* While the *Townsend* court agreed that the quest for unemployment benefits did not legally preclude the plaintiff from simultaneously seeking lost wages in workers' compensation

court, it did find that the receipt of unemployment benefits directly impacted "the claimants *credibility*." *Id.* (*emphasis by the court*). Accordingly, the court determined the "inconsistent statements" were admissible as "quasi-admissions" against interest. *Id*. citing, *St. Louis-SF Railway v. Nessmith*, 435 P.2d 602, 606 (Okla. 1967) (holding statements made by plaintiff to railroad retirement board for unemployment benefits constitutes "quasi-admissions").

Applying the *Townsend* precedent, this Court should find that Plaintiff's application for UI benefits, coupled with Plaintiff's employment records (including his disability application) are admissible as "quasi-admissions against interests."

5. **PRE AND POST-ACCIDENT CRASHES BEAR DIRECTLY ON PLAINTIFF'S ALLEGED INJURIES.**

Defendants have no intention of introducing evidence of Plaintiff's extensive history of automobile accidents for the purpose of establishing Plaintiff is a "bad driver." To the contrary, Defendant, Mohammed Halac, has already admitted fault. Therefore, this case will hinge upon the nature, extent, and cause of Plaintiff's claimed injuries. Credibility will be key.

Importantly, Plaintiff has been involved in automobile accidents both before and after the one giving rise to this case. It is undeniable that these crashes may have caused or contributed to his injuries. Plaintiff's medical records first reveal injury to his back following a motor vehicle accident in 1999, in which Plaintiff struck a deer. He initially reported no injury to his back as a result of this accident, but reported to the hospital roughly a month later complaining of lingering pain and discomfort in his lower back. (*See* record from Northern Oswego County Health Services, dated December 10, 1999, **EXHIBIT 7**.) Plaintiff was not able to recall the extent of his medical treatment following this accident, but denied injury to his back. (*See* Plaintiff's deposition, 124:2 – 20, **EXHIBIT 1**.)

The accident giving rise to the present litigation occurred on January 12, 2013. X-rays taken that night revealed **_degenerative_** changes in Plaintiff's back, consistent with a prior back injury. (*See* record from Integris Mayes County Medical Center, dated January 12, 2013, **EXHIBIT 8**.) After the subject accident, Plaintiff began receiving conservative treatment of his back, which he undertook up until the time of **_another_** automobile accident on February 21, 2015. Less than one month later, Plaintiff returned to his physician and reported that while physical therapy and other conservative care had originally improved his back pain, his pain had **_recently_** worsened. (*See* record from Utica Park Clinic, dated March 17, 2015, **EXHIBIT 9**.) When asked about this accident during his deposition, Plaintiff again denied that he was injured as a result of it. (*See* Plaintiff's deposition, 100:8 – 10, **EXHIBIT 1**.) Also, despite the fact that the February 21, 2015, accident caused twice as much property damage to his vehicle (Plaintiff was operating the same vehicle at the time of both accidents), Plaintiff described it as "a lot less severe" than the one giving rise to the present litigation. (*See* Plaintiff's deposition, 95:6, **EXHIBIT 1**.)

On June 6, 2015, almost two and one-half years following the accident giving rise to the present litigation, but only three to four months following Plaintiff's second automobile accident (and the corresponding increase in back pain), one of Plaintiff's treating physicians, Dr. James Mayoza, performed a left hemilaminectomy and disc excision on Plaintiff's lumbar spine at L4-5. (*See* operative report of Dr. James Mayoza, dated June 6, 2015, attached as **EXHIBIT 10**.)

Incredibly, Plaintiff suffered yet another automobile accident just months later, on October 18, 2015. Immediately following this accident, Plaintiff returned to Dr. James Mayoza and complained of **_increased_** pain as a direct result of this most recent accident. (*See* record from Tulsa Orthopaedic Associates, Inc., dated October 20, 2015, **EXHIBIT 11**.) Plaintiff's deposition had already taken place at the time of this final accident. However, if the past is any indicator of the

future, Plaintiff will presumably testify that he received no injury in this most recent automobile accident.

The fact of these accidents occurrence, as well as the corresponding increase in Plaintiff's pain following each, suggests that they may have caused some pathological changes or injury to Plaintiff's spinal condition. While Plaintiff may believe that all of his present maladies were caused solely by the January 12, 2013, accident, evidence of multiple additional crashes erode such a claim. As part of his *prima facie* case of negligence, Plaintiff's burden at trial will be to establish that Defendants' actions proximately caused the injuries Plaintiff currently complains of. Plaintiff now seeks to exclude evidence at trial which bears directly on this question.

6.    **UNDER NEWLY REVAMPED LAW, NON-USE OF A SEAT BELT IS ADMISSIBLE.**

Plaintiff's entire Proposition No. 6 is filled with nothing but case law quoting a **prior** version of the Oklahoma Mandatory Seat Belt Use Act, which was superceded by the Oklahoma legislature in 2013. (*See* Okla. 2013, 1st Extr. Sess., HB 1015, c. 11, § 5, attached as **EXHIBIT 12**.) Thus, the entirety of Plaintiff's Proposition No. 6 is a misstatement of current law. Section 12-420 of Title 47 of the Oklahoma Statutes **currently** reads in its entirety:

> Sections 12-416 through 12-420 of this title **may** be used in any civil proceeding in this state and the use or nonuse of seat belts **shall** be submitted into evidence in any civil suit in Oklahoma unless the plaintiff in such suit is a child under sixteen (16) years of age.

(emphasis added). Plaintiff is certainly not under sixteen (16) years of age. Thus the use or nonuse of his seatbelt at the time of the present accident is indeed admissible.

7.    **NOT IN ORIGINAL. ERROR IN NUMBERING IN PLAINTIFF'S MULTIFARIOUS MOTION IN LIMINE.**

8.     LEGAL STANDARD FOR EXPERT TESTIMONY.

Under Oklahoma law, admissible opinions of medical experts are required to be based on "a reasonable degree of medical certainty," rather than a "preponderance of the evidence."  *See Reed v. Scott*, 820 P.2d 445, 448-49 (Okla. 1991).  Plaintiff's Motion *in Limine* appears to be an escape hatch for his failures to properly designate Rule 26 experts (*See* DKT. NO.  41.)

In *Potts v. Sam's Wholesale Club*, 108 F.3d 1388 (Table), 1977 WL 126089, at \*2 (10th Cir. 1997) (unpublished), the United States Court of Appeals for the Tenth Circuit discussed Oklahoma's standard for admissible medical opinions and held: "Requiring medical opinions regarding causation to be made to a 'reasonable degree of medical certainty' is a well-established evidentiary standard, and Oklahoma appears to follow other states that have adopted the general standard."  (citing *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 472 (Okla. 1987).

The United States Supreme Court agrees. In *Addington v. State of Texas*, 441 U.S. 418, (1979), the Court held: "[w]ithin the medical discipline, the traditional standard for 'factfinding' is a 'reasonable medical certainty.'" Likewise, in *Rush Truck Center v. Watson*,159 P.3d 1146, 1148 (Okla. Civ. App. 2007), the Oklahoma Court of Civil Appeals considered an appeal from a decision of the Workers' Compensation Court, and held: "[m]edical opinions addressing compensability and permanent impairment must be stated within a reasonable degree of medical certainty." Finally, in *Christian v. Gray*, 65 P.3d 591, 607 (Okla. 2003), the Supreme Court of Oklahoma held that the *Daubert* standard is the appropriate standard for determining the admissibility of expert testimony in civil matters, *i.e.*, when a expert's opinion relates to causation, reliability of that opinion is provided when the expert's opinion is based upon a reliable method for determining causation and the conclusion is analytically appropriate to that method.  *Id*.  The reliability of the method is not shown merely because the expert dutifully recites that causation exists.  *Id.*

While absolute certainty is not required, Plaintiff's expert witnesses' testimony must rise to the level of opinions offered to a reasonable degree of medical certainty. *Reed v. Scott*, 820 P.2d 445, 448-49 (Okla. 1991). If Plaintiff's expert witnesses' opinions are limited to mere guesswork or some "balance of the probabilities" conclusion, then their opinions are neither reliable, nor relevant, as they would not assist the trier of fact in this matter, and would only confuse the issues.

9.      **12 O.S. § 3009.1 IS BOTH CONSTITUTIONAL AND APPLICABLE.**

The standard of review governing the issue before this Court was aptly stated in *Fent v. Oklahoma Capitol Improvement Authority,* 984 P.2d 200, 204 (Okla. 1999), to wit:

> In considering a statute's constitutionality, courts are guided by well established principles. *Application of Oklahoma Capitol Improvement Authority,* 1960 OK 207, 355 P.2d 1028, 1031. A heavy burden is cast on those challenging a legislative enactment to show its unconstitutionality and every presumption is to be indulged in favor of the constitutionality of a statute. *Application of Oklahoma Capitol lmprovement Authority,* 1998 OK25, 958 P.2d 759, 763, *cert. denied* 525 U.S. 874 (1998). If two possible interpretations of a statute are possible, only one of which would render it unconstitutional, a court is bound to give the statute an interpretation that will render it constitutional, unless constitutional infirmity is shown beyond a reasonable doubt. *Gilbert Central Corp. v. State,* 1986 OK 6, 716 P.2d 654, 658. A court is bound to accept an interpretation that avoids constitutional doubt as to the legality of a legislative enactment. *Id.*

It is also firmly recognized that it is not the place of this Court, or any court, to concern itself with a statute's propriety, desirability, wisdom, or its practicality as a working proposition. *Application of Oklahoma Capitol Improvement Authority, supra,* 355 P .2d at 1031; *Oklahoma Industries Authority v. Barnes,* 769 P.2d 115, 119 (Okla. 1988) (the judiciary cannot challenge the wisdom, need or desirability of any constitutionally valid legislation). Such questions are plainly and definitely established by our fundamental law as functions of the legislative branch of government. *Application of Oklahoma Capitol Improvement Authority, supra,* 355 P.2d at 1031. Respect for the integrity of our tripartite scheme for distribution of governmental powers commands

that the judiciary abstain from intrusion into legislative policymaking. *Oklahoma Industries Authority v. Barnes, supra,* 769 P.2d at 119. A court's function, when the constitutionality of a statute is put at issue, is limited to a determination of the validity or invalidity of the legislative provision [*Application of Oklahoma Capitol Improvement Authority, supra,* 355 P .2d at 1031] and a court's function extends no farther in our system of government.

This standard of review places a heavy burden upon the challenging party to demonstrate the "statute is clearly, palpably, and plainly inconsistent with the Constitution." *Lafalier v. Lead-Impacted Communities Relocation Assistance Trust*, 237 P.3d 181, 188 (Okla. 2010). The Court is to presume every statute is constitutional and must "scrutinize a constitutional attack on a statute with great caution and grave responsibility." *Id.* at 189. Further, the Court is to presume that the Legislature has not done a vain and useless act. *Surety Bail Bondsmen of Okla., Inc. v. Ins. Comm'r,* 243 P.3d 1177, 1185 (Okla. 2010).

Plaintiff advances three arguments that 12 O.S. § 3009.1 is unconstitutional. All three of his arguments are unpersuasive and contrary to well-established Oklahoma law. Indeed, two of them are unsupported by any Oklahoma law, and one of them merely recites: "[t]he Oklahoma Constitution is fully of guarantees of the person's right for have fair litigation. of litigation." (*See* Plaintiff's First Motion *in Limine*, p. 11, **DKT NO. 39**.) Defendants respond to this statement, and Plaintiff's other arguments, in turn, below.

### PROPOSITION I: TITLE 12 O.S. § 3009.1 IS NOT A SPECIAL LAW, AND THEREFORE, DOES NOT VIOLATE ARTICLE 5 § 46 OF OKLAHOMA'S CONSTITUTION.

Plaintiff asserts 12 O.S. § 3009.1 is unconstitutional because it violates the prohibition against special legislation set forth in Article 5, § 46 of the State Constitution. To prevail, Plaintiff must overcome the presumption of constitutionality and demonstrate the "statute is clearly, palpably,

and plainly inconsistent with the Constitution." *Lafalier*, 237 P.3d at 189. Nothing in Plaintiff's brief, however, establishes this statute is unconstitutional.

The issue in any constitutional challenge under Article 5 § 46 is whether the statute is a *general law* or a *special law*. *Reynolds v. Porter*, 760 P.2d 816, 823 (Okla. 1988). Thus, if the statute in question is a "general law," it does not violate section 46's prohibition and is constitutional. Conversely, if the statute in question is a "special law dealing with one of section 46's enumerated subjects, then it does not meet section 46's mandate and is unconstitutional." *Lafalier*, 237 P.3d at 192.

A *general law* "'relates to persons or things as a class rather than relating to particular persons or things.'" *City of Enid v. Pub'l Employees Relations Bd.*, 133 P.3d 286 (Okla. 2006) (quoting *Grant v. Goodyear Tire & Rubber, Oc.*, 5 P.3d 594, 597(Okla. 2000)). Although the Supreme Court has provided this seemingly simple definition, it is well recognized the phrase *general law* as used in state constitutions is not capable of a simple and exact definition. *Lafalier*, 237 P.3d at 292 (Edmondson, J., concuring) (citing Charles C. Binney, *Restrictions upon Local and Special Legislation in State Constitutions*, 21-22 (1984)). As the Supreme Court stated in *Burks v. Walker*, 109 P. 544 (Okla. 1909):

> In order for a law to be general in its nature and to have a uniform operation, **it is no necessary that it shall operate upon every person and every locality in the state.** A law may be general and have a local application or apply to a designated class if it operates equally upon all the subjects within the class for which it was adopted. **To determine whether or not a statute is general or specific, courts will look to the statute to ascertain whether it will operate uniformly upon all the persons and parts of the state that are brought within the relation and circumstances provided by it.** And the operation is uniform if it affects alike all persons in like situation. But, where a statute operates upon a class, the classification must not be capricious or arbitrary, and must be reasonable and pertain to some peculiarity in the subject–matter calling for the legislation. As between the persons and places included within the

> operation of the law and those omitted, there must be some distinctive characteristic upon which a different treatment may be reasonably founded, and that furnishes a practical and real basis for discrimination.

*Id.* at 549 (internal citations omitted, emphasis added).

Plaintiff alleges 12 O.S. § 3009.1 is unconstitutional because it creates a subclass of civil litigation "involving personal injuries." Plaintiff's analysis relies almost exclusively on the Oklahoma Supreme Court's holding in *Zeier v. Zimmer, Inc*, 152 P.3d 861 (Okla. 2006). Plaintiff's reliance on *Zeier* is misplaced, as Plaintiff overlooks the marked difference between the statutes at issue in *Zeier* and this case. In *Zeier*, the Oklahoma Supreme Court struck down 63 O.S. § 1-1708.1E, which required a plaintiff alleging **medical malpractice** to attach an affidavit of merit to the petition, as unconstitutional.

"[T]he Court concluded the statute had 'no counterpart in the general law of tort claims.'" *Woods v. Unity Health Center, Inc.*, 196 P.3d 529, 531(Okla. 2008) (quoting *Zeier*, 152 P.3d at 868). Thus, the statute impermissibly divided negligence claimants into two classes – those pursuing **general negligence claims** and those pursuing **medical negligence claims**. *Zeier*, 152 P.3d at 867 ("The affidavit of merit requirement immediately divides tort victims alleging negligence into two classes – those who pursue a cause of action in negligence generally and those who name medical professionals as defendants.") Said another way, the *Zeier* Court found the imposition of the affidavit requirement solely on the class of medical negligence plaintiffs to be an unconstitutional special law.

Unlike the statute at issue in *Zeier*, 12 O.S. § 3009.1 does not create a "subclass" unknown to common law. Moreover, 12 O.S. §3009.1 does not violate this provision, as it treats the entire class of similarly situated persons the same. The determination of classes for the purpose of lawmaking is a distinctly legislative function. As the Oklahoma Supreme Court has stated,

22

"classification is at the heart of the legislative function . . . judgment as to where to draw the line between groups for the purpose of protecting the public fisc." *Glasco v. State ex rel. Oklahoma Dept. of Corr.*, 188 P.3d 177, 185-86 (Okla. 2008).

It is black letter law that the measure of damages for personal injuries is the "amount which will compensate for all detriment proximately caused thereby." 23 O.S. § 61. "Detriment" is statutorily defined as "a loss or harm suffered in person or property." 23 O.S. § 4. Thus, the primary object of an award of damages in a civil action is the just compensation for the loss or injury sustained by the plaintiff. "Oklahoma law does not generally allow a party to recover more than 'the maximum recoverable loss that the party has sustained,' *i.e.*, a party is not entitled to double recovery." *Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1236 (10th Cir. 2003) (quoting *Black's Law Dictionary* 1280 (7th ed. 1999)).

Despite this well established principal, Plaintiff argues that the statute treats Plaintiff's alleging claims arising out of personal injuries differently than those alleging claims arising out of personal property damage. It is clear that 12 O.S. § 3009.1 does not treat personal injury claims any different than personal property damage claims. Title 12 O.S. § 3009.1 simply allows personal injury plaintiffs to recover what they are owed while preventing plaintiffs from recovering damages they never sustained. As the Court can clearly see, Plaintiff's actual argument herein is not a constitutional one; rather, it is a bold demand that Plaintiff should be allowed to recover more damages than he actually sustained in the accident. This Court should not allow such a demand. Moreover, it is clear that 12 O.S. § 3009.1 is not a special law that violates Article 5, § 46 of the State Constitution.

**PROPOSITION II: TITLE 12 O.S. § 3009.1 DOES NOT TREAT THE INSURED AND UNINSURED UNEQUALLY.**

Plaintiff fails to cite any legal authority in support of his proposition that 12 O.S. § 3009.1 treats insureds and uninsureds unequally. Rather, Plaintiff's entire argument is pure speculation and conjecture that requests the Court to play along. Plaintiff's argument relies entirely on baseless hypothetical and speculation which fails to even address the amounts Medicare/Medicaid will pay for an uninsured claimant's incurred medical bills. Plaintiff's arguments are nothing more than pure hyperbole.

Plaintiff's argument appears to advocate for the imposition of another "class" affected by the alleged "special" law, but Plaintiff's arguments should not be entertained by this Court, for the reasons mentioned in Proposition I, above. This Court should not find that 12 O.S. § 3009.1 treats insureds and uninsureds unequally based on Plaintiff's conjecture that health insurance inures to the benefit of defendants "and not to the plaintiff." There is absolutely no merit to this contention.

**PROPOSITION III: TITLE 12 O.S. § 3009.1 DOES NOT DENY THE PLAINTIFFS DUE PROCESS AND TRIAL BY JURY.**

Plaintiff broadly argues that Section 3009 .1 denies him due process and the right to trial by jury, presumably based upon Article 2, Sections 6, 7 and 19 of the Oklahoma Constitution and the Fourteenth Amendment to the United States Constitution. Defendants are unsure of the exact foundation upon which Plaintiff's argument rests as he again provides no legal support for his argument. Plaintiff's argument consists of three sentences. The second and third of which are nonsensical. However, boiled down, Plaintiff's due process argument appears to be that it is essentially unfair that he cannot introduce medical bills, including phantom amounts, that do not represent Plaintiff's actual economic harm. In short, Plaintiff wants to introduce evidence of more damages than he is entitled. All Plaintiff has done is make generalized statements about the rights

afforded litigants without demonstrating any direct link between Section 3009.1 and a loss of access to the courts, due process or his right to trial by jury.

Since Defendants are forced to guess at what basis Plaintiff is arguing 12 O.S. § 3009.1 is unconstitutional, Defendants state, initially, that Section 3009.1 does not violate Article 2, Section 6 of the Oklahoma Constitution. Article 2, Section 6 prohibits "bar the door" statutes limiting access to Oklahoma courts based upon the expenditure or payment of money. The Oklahoma Supreme Court struck down *Zeier v. Zimmer, Inc, supra,* which required an affidavit of merit in medical malpractice cases. It did so because the medical affidavit created an unconstitutional monetary barrier to the courthouse door. *Zeier,* 152 P.3d at 874. Section 3009.1 is distinct from statutes that severely limit or outright bar access to the courthouse doors. Section 3009.1 places no financial burden on claimants, as was the case in *Zeier,* and it in no way prevents personal injury claims from being heard by a jury. Rather, Section 3009.1 merely prevents personal injury plaintiffs from making double or triple recoveries based on fictitious amounts they have no obligation to pay.

Article 2, Section 6 of the Oklahoma Constitution does not guarantee Plaintiff any right to present evidence of medical expenses in excess of their actual economic loss. Instead, Section 6 guarantees Plaintiff the right to have access to the courts to seek recovery of the rights the Oklahoma Legislature has granted him. "Section 6 is intended to guarantee that the judiciary would be open and available for the resolution of disputes, but not to guarantee that any particular set of events would result in court-awarded relief." *City of Anadarko v. Fraternal Order of Police, Lodge 118,* 934 P.2d 328, 330 (Okla. 1997). Here, Plaintiff has unconvincingly invoked Section 6 "to attack this substantive legislative policy choice." *Rivas v. Parkland Manor,* 12 P.3d 452, 458 (Okla. 2000). When directed at a "valid legislative classification ... different statutory administrative and judicial

remedies may be provided to the class without violating the OKLA. CONST., art. II, § 6." *Glasco v. State ex. rel. Okla. Dept. of Corr.,* 188 P.3d 177, 178(Okla. 2008).

To the extent Plaintiff's arguments attempt to rely on Section 6's remedy guarantee, they still fail. Section 3009.1 does nothing to limit Plaintiff's ability to obtain a remedy for his incurred medical expenses. Rather, it contains an evidentiary rule that requires the evidence Plaintiff may present in pursuit of his remedy to actually represent his true economic harm. A far greater showing than what Plaintiff has presented in this case is required to show deprivation of a remedy in violation of Section 6. *Rivas, supra.* (Section 6 does not even "deprive the Legislature of the power to abolish remedies" much less the power to craft rules for the presentation of evidence.) Plaintiff has failed to provide any authority supporting a claim that Section 3009.1 violates Article 2, Section 6 of the Oklahoma Constitution. Plaintiff is clearly able to access the courts to pursue his personal injury claim, and he will be fully allowed to present evidence of his actual economic loss should this case proceed that far.

Insofar as Plaintiff's Motion relies on Article 2, Section 19 of the Oklahoma Constitution, Defendants cannot conceive how Section 3009.1 prevents Plaintiff from a trial by jury. This matter is currently scheduled to be tried by a jury in a matter of months. Plaintiff will have the opportunity to have his case tried by a jury. Any argument to the contrary is nonsensical. Section 3009.1 has no bearing on Plaintiff's right to trial by jury. Rather, Section 3009.1 encourages the fair presentation of evidence to the jury by requiring the medical bills presented to represent actual out-of-pocket costs. Similarly, in any reliance on Article 2, Section 7 of the Oklahoma Constitution and the Fourteenth Amendment to the United States Constitution, Plaintiff utterly fails to articulate how he is denied due process of law, either procedural or substantive, or equal protection of the laws. The application of a statute to a class that the Oklahoma Supreme Court has declared an acceptable

general class is hardly sufficient to demonstrate an absence of due process. *Lafalier v. Lead-Impacted Communities Relocation Assistance Trust,* 237 P.3d 181, 193 (Okla. 2010).  Therefore, as argued herein, Plaintiff has failed to demonstrate that Section 3009.1 is unconstitutional beyond a reasonable doubt.

Respectfully submitted,

s/ Paul M. Kolker
Brad L. Roberson, OBA No. 18819
Paul M. Kolker, OBA No. 18749
Erin J. Rooney, OBA No. 31207
PIGNATO, COOPER, KOLKER & ROBERSON, P.C.
Robinson Renaissance Building
119 North Robinson Avenue, 11th Floor
Oklahoma City, Oklahoma 73102
Telephone:      405-606-3333
Facsimile:      405-606-3334
**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Gary A. Eaton, Esquire
Gerald Robert Lee, Esquire
Wm. E. Sparks, Esquire

s/ Paul M. Kolker
For the Firm
